IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WANDA TONEY, : | |
| : | |
| PLAINTIFF, : | |
| : | |
| v. : | **COMPLAINT** |
| : | |
| STATE UNIVERSITY OF NEW YORK; : | |
| at SULLIVAN; STEPHEN MITCHELL; and : | |
| CINDY BENNEDUM-KASHAN, : | **TRIAL BY JURY** |
| individually, : | **DEMANDED** |
| : | |
| DEFENDANTS. : | |
| : | |

Plaintiff Wanda Toney ("Toney"), by and through undersigned counsel, complains about the Defendants, State University of New York at Sullivan, Stephen Mitchell, and Cindy Bennedum-Kashan, as follows:

## NATURE OF THE CASE

1. This is an employment discrimination and retaliation case brought pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.SC. §§ 2601 *et seq*.; Americans with Disabilities Act, § 42 U.S.C. § 12101 *et seq*., as amended, ("ADA"); and the New York State Human Rights Law, New York Executive Law §§ 296 *et seq*. ("NYSHRL").

## JURISDICTION AND VENUE

2. The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

3. The Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims closely relate to Plaintiff's federal claims, having arisen from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

4.  Venue is proper in the Southern District of New York under 28 U.S.C. § 1391 because the relevant acts and omissions took place in Sullivan County.

## THE PARTIES

5.  Plaintiff is an adult resident of Sullivan County, New York.

6.  Plaintiff was a full-time employee of Defendant State University of New York at Sullivan from June 22, 2016 until her illegal termination of employment on April 6, 2018.

7.  Plaintiff's job title was Administrative Associate to the Associate Vice President of Planning, Human Resources and Facilities, and to the Dean of Community Outreach.

8.  Plaintiff is the primary care-giver to her elderly mother who has several serious medical conditions that affect her ability to carry out basic life activities.

9.  Defendant State University of New York at Sullivan ("SUNY Sullivan") is a community college within the State University of New York (SUNY) system located in Sullivan County, New York.

10. At all relevant times, Defendant SUNY Sullivan employed more than fifty (50) employees at its Sullivan County location.

11. At all relevant times, Defendant SUNY Sullivan was Plaintiff's employer within the meaning of the FMLA, ADA, and NYSHRL.

12. Defendant Stephen Mitchell ("Mitchell") is an adult resident of Sullivan County, New York, and works as Defendant SUNY Sullivan's Associate Vice President of Planning, Human Resources, and Facilities.

13. At all relevant times, Defendant Mitchell was Plaintiff's supervisor within the meaning of the FMLA, ADA, and NYSHRL.

14. Defendant Cindy Bennedum-Kashan ("Bennedum-Kashan ") is an adult resident of Sullivan County, New York, and works as SUNY Sullivan's Dean of Community Outreach.

15. At all relevant times, Defendant Bennedum-Kashan was Plaintiff's supervisor within the meaning of the FMLA, ADA, and NYSHRL.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16. On May 2, 2018, Toney filed a Charge of Discrimination against Defendant SUNY Sullivan, alleging discrimination based on her association with a disabled person, with the U.S. Equal Employment Opportunity Commission ("EEOC").

17. On or around September 20, 2018, Toney received a Notice of Right to Sue Letter from the EEOC.

18. This action has been commenced within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue Letter from the EEOC.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS

19. On June 22, 2016, Defendants Mitchell and Bennedum-Kashan hired Plaintiff to work as an administrative associate.

20. That day, Toney received a formal document summarizing her job duties.

21. The job description describes Toney's position as "report[ing] to both the Associate Vice President for Planning, Human Resources and Facilities [Defendant Mitchell] and to the Dean of Community Outreach [Defendant Bennedum-Kashan]."

22. The last duty listed in the job description is described as follows: "Performs other reasonable and appropriate duties as might be assigned by [Defendant Mitchell] and/or [Defendant Bennedum-Kashan]."

23. Importantly, the job description does not list Toney's position as reporting to anyone other than Defendants Mitchell and Bennedum-Kashan.

24. Additionally, the job description does not define night or weekend work as a regular duty.

25. Before she requested leave pursuant to the Family and Medical Leave Act to care for her sick mother, Toney's regular work hours were Monday through Friday from 8:00 a.m. to 4:00 p.m.

26. Before she requested leave pursuant to the FMLA to care for her sick mother, Toney was expected to split her work-week between Defendants Mitchell and Bennedum-Kashan and provide administrative support to each supervisor two-and-a half days each week.

27. Defendant SUNY Sullivan holds outreach events on some nights and weekends during the academic year.

28. Before she requested leave pursuant to the FMLA to care for her sick mother, from time to time, Director of Events and Campus Activities, Hillary Egeland ("Egeland"), would ask Toney to help out at certain events that were held outside of her regular work hours.

29. On or about April 25, 2017, when she had been in her position for about ten (10) months and before Toney requested leave under the FMLA to care for her sick mother, Defendants Mitchell and Bennedum-Kashan issued to her a positive performance review.

30. The April 2017 performance review lists four major objectives, states that Toney "accomplished each of these objectives," and affords her a rating of "meets expectations" for each.

31. In the performance review, Defendant Mitchell noted that Toney's "calm and professional demeanor has a positive impact," and added, "my only concern is that Wanda may be too calm."

32.     On September 11, 2017, Plaintiff contacted Defendants Mitchell and Bennedum-Kashan by e-mail to inform them that she anticipated using some of her accrued paid time off in the near future because her mother was ill and would need assistance to get to and from doctors' appointments, which were scheduled during Toney's regular work hours.

33.     On September 17, 2017, Plaintiff Toney requested an FMLA form from Assistant Director of Human Resources Stephanie Smart ("Smart").

34.     On the FMLA form, Toney noted that she was seeking intermittent leave rather than full-time leave; a main concern for Toney was being able to take her mother to doctors' appointments.

35.     On September 18, 2017, Smart provided Plaintiff Toney with a letter approving her "absence" under the FMLA.

36.     The letter also states: "Since you are using intermittent FMLA to attend to the illness of a parent, you will need to present a leave plan to both offices clearly outlining your availability so that the offices can continue to operate efficiently in your absence."

37.     On September 29, 2017, per Smart's directive, Plaintiff Toney emailed her supervisors, Defendants Mitchell and Bennedum-Kashan, formally requesting their approval of her specific plan for her limited/intermittent leave under the FMLA.

38.     Under Toney's proposed FMLA leave plan, she would use six (6) hours of leave per week. Her hours on Mondays, Wednesdays, and Fridays would remain the same, and on Tuesdays and Thursdays she would arrive later in the morning.

39.     Defendants Mitchell and Bennedum-Kashan approved Toney's proposed FMLA leave plan.

40. However, on October 3, 2017, after Plaintiff had used FMLA leave to care for her mother for approximately two full weeks, Defendants Mitchell and Bennedum-Kashan called Toney into a meeting.

41. At that time, Defendants Mitchell and Bennedum-Kashan criticized Plaintiff's job performance for the first time, alleging that Toney was "not doing [her] job."

42. In the meeting, Defendants Mitchell and Bennedum-Kashan claimed that two of their subordinates, Smart and Egeland, had complained that Toney failed to perform certain tasks when they directed her to.

43. For the first time during her tenure working for Defendants, Defendants Mitchell and Bennedum-Kashan intimated that notwithstanding Toney's title and job description, Plaintiff was supposed to take direction from Defendants Mitchell and Bennedum-Kashan and their subordinates.

44. Also during that meeting, Defendants Mitchell and Bennedum-Kashan stated that Egeland complained Toney would not work at events on nights and weekends.

45. The reality was that Toney had worked at many events on nights and weekends during her time at SUNY, even though such work was not part of her required duties in her job description. However, once Plaintiff's mother physical condition began to deteriorate, she could no longer work the additional hours and events.

46. Toney specifically informed Defendants Mitchell and Bennedum-Kashan that her mother's physical condition was deteriorating and that the increased demands this situation placed on her meant that she was unable to take on any additional work hours beyond what she was normally required to do.

47.  Toney also complained that requiring her to work additional hours during evenings and weekends would interfere with her ability to attend church.

48.  Despite the fact that Plaintiff specifically told them she could not take on any additional work hours because of her obligations to her sick mother and interfere with her religious observance, Defendants Mitchell and Bennedum-Kashan issued to Toney an ultimatum at that meeting: Plaintiff must either work all of the additional hours required, or else take full-time leave under the FMLA.

49.  Because her mother required her assistance, the option of working more hours was untenable for Toney. Plaintiff felt she had no choice but to take the only other option presented to her by Defendants: taking full-time leave under the FMLA.

50.  Thereafter, Defendants Mitchell and Bennedum-Kashan framed Toney's full-time FMLA leave as having been Plaintiff's own idea and her choice in documents regarding the leave.

51.  Plaintiff began taking full-time leave from work to care for her sick mother under the FMLA on October 5, 2017.

52.  By on or about January 9, 2018, Toney had used all of her available leave under FMLA and returned to full-time work at SUNY Sullivan.

53.  The day after her return to work from FMLA leave, on or about January 10, 2018, Defendant Mitchell gave Toney an alleged "Semi-Annual Performance Review" document ostensibly memorializing the October 3, 2017 meeting.

54.  The "Semi-Annual Performance Review" contained several false allegations about Toney's performance that neither of Defendants Mitchell or Bennedum-Kashan mentioned during the meeting on October 3, 2017.

55. When Defendant Mitchell gave Toney the "Semi-Annual Performance Review" document, he told her that they would meet together with Defendant Bennedum-Kashan at a later date to discuss the document and to have Toney sign it.

56. In the alleged Semi-Annual Performance Review, Defendants Mitchell and Bennedum-Kashan wrongly criticize Toney for not taking enough initiative to improve the efficiency of some office procedures.

57. In reality, Toney had created more efficient processes for tracking receipts, payments, and check requests, as well as revamping the procedure for mass mailings, reducing the number of bad address returns in the process.

58. Notably, in the Semi-Annual Performance Review, Defendants Mitchell and Bennedum-Kashan admitted that they were instrumental in the decision that Plaintiff take full-time FMLA leave to care for her mother, which Toney did not want to do, noting that "after both the VP and Dean meeting in person to review our concerns on October 3, and with Wanda's ongoing issues outside of the college that involve taking care of her ill mother, we are in concurrence that perhaps the best action at this time is for Wanda to take full time FMLA leave."

59. Shortly after her return from FMLA leave, Toney noticed that the screen of her work computer began to regularly light up in a way that suggested her computer activity was being remotely monitored.

60. On February 1, 2018, Plaintiff received a "write-up" memorandum from Defendants Mitchell and Bennedum-Kashan in which they were critical of Toney's job performance again, and specifically found fault with her for issuing to them a written response to her performance review and their false allegations regarding her work performance.

61. Defendants' write-up acknowledges that Toney responded to Defendants alleged Semi-Annual Performance Review in writing with "extensive comments, disputing and/or providing explanation for several of the incidents cited in the review," but vaguely dismisses Toney's feedback and corrections by claiming that "[s]taff in both departments disagree strongly with many of Wanda's comments" and asserting that "[c]ontinued engagement in this dispute over past actions and performance is pointless."

62. Defendants' write-up also specifically directs Plaintiff that "performance dialogue" be "based on face-to-face conversations" rather than back-and-forth conversations in writing.

63. Ironically, in the write-up document, Defendants fault Toney for her assertive behavior in addressing their false and misleading statements regarding her performance, after giving the opinion in Toney's annual review that she was allegedly "too calm[.]"

64. A few days later, on or about February 5, 2018, Mitchell gave Toney a hard copy of her job description. That document does not match the one given to her on June 22, 2016.

65. One of the changes Defendants Mitchell and Bennedum-Kashan made to Toney's job description was to add, under "JOB SUMMARY," "Evening and weekend hours will be required."

66. Other changes to Toney's job description include an addition of ten (10) new duties—five (5) each under the respective headings "Provide administrative support for Community Learning and Events" (Egeland) and "Provide administrative support for Human Resources" (Smart).

67. Also on or about February 5, 2018, Mitchell warned Toney not to document their communications about work-place issues by using email.

68. On February 7, 2018, Toney sent an email to Defendants Mitchell and Bennedum-Kashan explicitly complaining about retaliation for her use of leave under the FMLA.

69. On February 8, 2018, Defendant Mitchell replied to Plaintiff's email with three false claims.

70. The first claim was that Toney had made specific statements about her own performance that she had not, in fact, made.

71. The second claim was that it had been Toney's decision to apply for full-time leave under the FMLA, when in fact Mitchell and Bennedum-Kashan had given her an ultimatum to either take such full-time leave, or else perform a work schedule (including night and weekend work) that they already knew or should have known would be impossible for her to perform during her mother's illness.

72. The third claim was that Toney had been told at the time of the October meeting that the meeting constituted her Semi-Annual Review. In fact, neither Defendant Mitchell nor Defendant Bennedum-Kashan disclosed that fact to Toney until more than three months later.

73. By mid-February 2018, Toney had begun to notice that her supervisors and co-workers appeared to be setting her up to fail or get in trouble in subtle ways.

74. For example, information Plaintiff needed to complete a task would sometimes be withheld, and some employees would announce a plan involving shared workflows only to fail to follow through, or would perform Toney's duties instead of letting Toney perform them.

75. On February 12, 2018, Toney emailed Defendant Mitchell and Smart a request to have Sundays, Thursday evenings, and the third Saturday of each month off for her religious observance.

76. Defendants never responded to Toney's request for a work schedule that accommodated her religious observance.

77. On or around February 20, 2018, Defendants Mitchell and Bennedum-Kashan issued to Toney a third alleged "written warning."

78. The February 20, 2018 document contains baseless allegations regarding Plaintiff's alleged poor performance and threatened the possibility of future termination of employment.

79. In the document, Defendants Mitchell and Bennedum-Kashan allege that Toney misused personnel information when she engaged in protected activity by calling her predecessor, a non-supervisory former employee, to ask about her regular job duties to determine if Defendants were imposing additional job duties on her.

80. However, Plaintiff had been encouraged by Defendants Mitchell and Bennedum-Kashan to contact her predecessor with any questions about work at any time.

81. Defendants Mitchell and Bennedum-Kashan also wrongly alleged that Plaintiff arrived late to a weekend event.

82. Two months later, on or about April 6, 2018, Defendants illegally terminated Toney's employment.

83. As a result of Defendants' unlawful discriminatory and retaliatory treatment, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional and physical damage such as high blood pressure, humiliation, insult to dignity, and other compensable damage.

## COUNT I

## INTERFERENCE WITH FMLA RIGHTS AGAINST ALL DEFENDANTS

84. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

85. At all relevant times to this action, Defendants employed Plaintiff within the meaning of the FMLA.

86. By the acts and practices described herein, Defendants interfered with the exercise of Plaintiff's rights under the FMLA and Defendants' violations of the FMLA were intentional and not made in good faith.

87. Plaintiff has suffered and will continue to suffer irreparable physical injury, monetary damages, mental anguish, emotional and physical damage, humiliation, insult to dignity, and other compensable damages as a result of Defendants' illegal practices.

## COUNT II

### RETALIATION IN VIOLATION OF THE FMLA AGAINST ALL DEFENDANTS

88. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

89. At all relevant times to this action, Defendants employed Plaintiff within the meaning of the FMLA.

90. By retaliating against Plaintiff for exercising her FMLA rights as described herein, which includes but is not limited to Plaintiff's termination of employment, Defendants violated the FMLA and Defendants' violations of the FMLA were intentional and not made in good faith.

91. Plaintiff has suffered and will continue to suffer irreparable physical injury, monetary damages, mental anguish, emotional and physical damage, humiliation, insult to dignity, and other compensable damages as a result of Defendants' illegal practices.

## COUNT III

### DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA AGAINST DEFENDANT SUNY SULLIVAN

92. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

93. At all relevant times to this action, Defendant SUNY Sullivan employed Plaintiff within the meaning of the ADA.

94. By the acts and practices described herein, Defendant SUNY Sullivan has discriminated against Plaintiff on the basis of her association with a person with a disability and/or perceived disability in violation of the ADA.

95. Defendant SUNY Sullivan acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

96. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional and physical damage, humiliation, insult to dignity, and other compensable damages as a result of SUNY Sullivan's discriminatory practices.

## COUNT IV

### RETALIATION IN VIOLATION OF THE ADA
### AGAINST DEFENDANT SUNY SULLIVAN

97. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

98. At all relevant times to this action, Defendant SUNY Sullivan employed Plaintiff within the meaning of the ADA.

99. Plaintiff engaged in protected activity under the ADA.

100. Because of this protected activity, Defendant SUNY Sullivan took adverse action against Plaintiff, which includes but is not limited to the fabrication of allegations regarding her poor work performance, the imposition of additional administrative responsibilities, the termination of her employment and additional conduct that would sufficiently deter a reasonable person from engaging in protected activity.

101. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional and physical damage, humiliation, insult to dignity, and other compensable damages as a result of Defendant SUNY Sullivan's retaliatory practices.

## COUNT V

### DISABILITY DISCRIMINATION IN VIOLATION OF NYSHRL AGAINST DEFENDANT SUNY SULLIVAN

102. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

103. At all relevant times to this action, Defendant SUNY Sullivan employed Plaintiff within the meaning of the NYSHRL.

104. By the acts and practices described herein, SUNY Sullivan has discriminated against Plaintiff on the basis of her association with a person with a disability and/or perceived disability in violation of the NYSHRL.

105. Defendant SUNY Sullivan acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

106. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional and physical damage, humiliation, insult to dignity, and other compensable damages as a result of Defendant SUNY Sullivan's discriminatory practices.

## COUNT VI

### DISCRIMINATION ON THE BASIS OF RELIGION IN VIOLATION OF NYSHRL AGAINST DEFENDANT SUNY SULLIVAN

107. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

108. At all relevant times to this action, Defendant SUNY Sullivan employed Plaintiff within the meaning of the NYSHRL.

109. By the acts and practices described herein, SUNY Sullivan has discriminated against Plaintiff on the basis of her religion in violation of the NYSHRL.

110. Defendant SUNY Sullivan acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

111. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional and physical damage, humiliation, insult to dignity, and other compensable damages as a result of Defendant SUNY Sullivan's discriminatory practices.

## COUNT VII

### RETALIATION IN VIOLATION OF THE NYSHRL AGAINST DEFENDANT SUNY SULLIVAN

112. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

113. At all relevant times to this action, Defendant SUNY Sullivan employed Plaintiff within the meaning of the NYSHRL.

114. Plaintiff engaged in protected activity under the NYSHRL.

115. Because of this protected activity, Defendant SUNY Sullivan took adverse action against Plaintiff, which includes but is not limited to the fabrication of allegations regarding her poor work performance, the imposition of additional administrative responsibilities, the termination of her employment and additional conduct that would sufficiently deter a reasonable person from engaging in protected activity.

116. Defendant SUNY Sullivan acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

117. Plaintiff has suffered and will continue to suffer irreparable physical injury, monetary damages, mental anguish, emotional and physical damage, humiliation, insult to dignity, and other compensable damages as a result of Defendant SUNY Sullivan's retaliatory practices.

## COUNT VIII

### AIDING AND ABETTING DISCRIMINTION AND RETALIATION IN VIOLATION OF NYSHRL SEC. 296(6) AGAINST DEFENDANTS MITCHELL AND BENNEDUM-KASHAN

118.   Plaintiffs hereby re-allege and incorporate by reference all allegations in the preceding paragraphs.

119.   By engaging in the illegal mistreatment of Plaintiff as described herein, Defendants Mitchell and Bennedum-Kashan aided and abetted discrimination based on disability and religion, and retaliation in violation of NYSHRL, Section 296(6).

120.   As a result, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional and physical damage, humiliation, insult to dignity, and other compensable damages as a result of Defendants Mitchell and Bennedum-Kashan's illegal practices.

### JURY DEMAND

121.   Plaintiffs demand trial on all issues triable by a jury.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court grant her injunctive relief to enjoin and permanently restrain Defendants for violating her civil rights under the FMLA, ADA, and the NYSHRL; declare that the acts and practices complained of herein are in violation of the FMLA, ADA, and the NYSHRL; render a judgment sufficient to compensate her for economic, emotional and psychic injuries, humiliation, suffering, insult to dignity, and to provide necessary treatment; and to punish Defendants for their violation of law and deter similar violations in the future; grant Plaintiff such interest as in permitted by law; attorneys' fees and all other costs associated with

bringing this action against Defendants; and, all such additional relief as this Court may deem just and appropriate under the circumstances.

Dated: December 17, 2018

        Respectfully submitted,

        LAW OFFICE OF DANIELA NANAU P.C.

        _____
        DANIELA NANAU

        89-03 Rutledge Avenue
        Glendale, New York  11385
        Telephone: (888) 404-4975
        Facsimile: (718) 998-6916
        E-Mail: dn@danielananau.com

        ATTORNEYS FOR PLAINTIFF